COURT OF APPEALS
DECISION
DATED AND FILED

October 22, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP1578-CR**

Cir. Ct. No. **2016CF1268**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

NATHAN J. FRIAR,

    DEFENDANT-APPELLANT.

        APPEAL from a judgment and an order of the circuit court for Dane County: JOSANN M. REYNOLDS and SUSAN M. CRAWFORD, Judges. *Affirmed.*

        Before Blanchard, Kloppenburg, and Graham, JJ.

¶1 KLOPPENBURG, J. Nathan J. Friar appeals his conviction, upon a jury verdict, for second-degree sexual assault with the use of force and the denial of his motion for postconviction relief.[1] Friar contends that the circuit court erred as a matter of law in admitting certain evidence and that Friar's trial counsel made certain errors that deprived Friar of his constitutional right to effective assistance of counsel. Specifically, Friar argues that: (1) the circuit court erroneously admitted (a) photographs of the victim's injuries, (b) testimony about the victim's post-assault demeanor, and (c) testimony by an examiner for the Sexual Assault Nurse Examiner (SANE) program and by the victim's roommates about the victim's prior consistent statements; and (2) trial counsel rendered ineffective assistance by (a) not objecting to testimony by the SANE examiner relating a narrative account of the alleged assault by the victim, (b) not impeaching the victim with prior inconsistent statements about the incident, and (c) not presenting expert testimony on the effects of alcohol consumption on a person with type 1 diabetes.

¶2 We conclude that the circuit court did not err in admitting the photographs; that the circuit court did not err in admitting the post-assault demeanor testimony; that Friar forfeited his challenge to admission of the SANE examiner's testimony about the victim's prior consistent statements; and that the circuit court erred in admitting testimony by the victim's roommates about the victim's prior consistent statements, but that the error was harmless. Finally, we conclude that Friar fails to show that his trial counsel provided constitutionally ineffective assistance. Therefore, we affirm.

---

[1] The Honorable Josann M. Reynolds presided over the proceedings before and at trial, and the Honorable Susan M. Crawford presided over the postconviction proceedings.

**BACKGROUND**

¶3      We now present in some detail pertinent trial testimony and undisputed facts to provide context for all of the issues raised on appeal. We will present additional background pertinent to each of the issues in the discussion that follows.

¶4      At 4:30 in the morning on June 5, 2016, a 21-year-old woman, M, woke up in Nathan Friar's bedroom in an apartment in downtown Madison. She texted friends, "OMG, please help" and "Hi. Help, please. I mean it. Call me back ASAP. I hate [Friar's apartment building] with all of me and everyone associated with it." Later that morning, after talking to her roommates, M called the University of Wisconsin–Madison Police, who directed her call to the City of Madison Police Department. Officer Michael Franklin responded to M's call and took an initial report in which he documented M's assertions that Friar had "grabbed her by the neck and pushed her onto the bed and held her down," that she had "started to black out the incident because she did not want to have sex with him," and that she had pain in her genitals but did not know what sexual activity had occurred. Officer Franklin escorted M to the hospital for a forensic exam.

¶5      At the hospital, Physician's Assistant Maureen Hall, an examiner for the SANE program, administered a six-hour forensic exam during which she documented abrasions to M's external genitalia and bruising to the left and right sides of M's neck, her right shoulder area, her collarbone, her upper chest, and her lower back. Hall completed a sexual assault report, in which she documented that M stated that she had been "held down all over" and strangled and that she "didn't remember everything" because "it's like I blacked out when I couldn't breathe."

M told Hall that the assailant's penis and fingers contacted her external genitals and that the assailant's fingers entered her vagina, but that she was unsure whether sexual intercourse or oral sex occurred. Hall also completed a strangulation report, in which she indicated that M rated the force of the assailant's grip on a scale of 1 (light) to 10 (crushing) as a 10. In her report Hall also documented that M was type 1 diabetic and that M had consumed alcohol on the evening of the alleged assault.

¶6 During the exam, M tried to call both of her parents. When she could not reach them, she called her younger siblings and asked them to have her parents return her call as soon as possible. M's father returned her call soon after; M attempted to explain to her father why she was in the hospital but became distraught and asked Hall to explain the situation to M's father. Later, M's mother called her back, and her mother joined M at the hospital.

¶7 Detective Kathleen Riley met with M the following day, at which time she observed multiple visible injuries on M's body.

¶8 Friar was charged with second-degree sexual assault with the use of force and with strangulation and suffocation. At the jury trial, M testified to the following account. She met Friar at a party a few days before the alleged assault, "liked" him, and gave him her number. After a few days of texting, they met up at a bar in downtown Madison and spent the evening talking, dancing, and making out. Friar invited M to his apartment for an after-party and, after the two talked and made out outside Friar's apartment building for a while, she agreed to go with him up to his apartment unit.

¶9 M further testified that once she was in the apartment, she realized that there was no after-party. Friar pulled M into his bedroom, where his manner

4

immediately changed and the making out became "aggressive and uncomfortable" and "forceful." Friar pushed M onto the bed and removed her clothes, detaching and damaging her insulin pump in the process, as she said "no" and "stop, slow down, be gentle." Friar held down one of her shoulders with one hand while his other hand was squeezing her throat and M was not able to breathe. While Friar was squeezing M's neck, he moved his other hand and inserted it forcefully into her vagina. Whenever Friar would briefly relax his grip on M's neck she would gasp for air and say "stop." M was afraid that she would pass out and "just not be able to breathe and die, because you need to breathe to live." At some point while Friar was strangling and penetrating her, M's mind went blank and she lost all memory. Sometime later she opened her eyes and Friar was passed out on top of her. Her vagina hurt and she observed blood coming from her genitals when she urinated; it took a week to ten days for her vagina to heal. M testified that neither her alcohol consumption nor its interaction with her diabetes clouded her memory or judgment. Until the point at which she blacked out while Friar strangled her, her memories of the evening were clear.

¶10   The State further presented testimony by law enforcement and SANE examiner Hall regarding M's reports of the assault and her injuries. During Hall's testimony, she read directly from her report a one-paragraph narrative statement that M had provided in response to the question "What happened?" The State also presented extensive video footage documenting Friar's and M's interactions at the bar and outside Friar's apartment building, including video showing that M's neck was not visibly bruised when she entered the apartment building at around 3:00 AM but that it was visibly bruised when she left at around 4:30 AM.

¶11   Friar denied ever strangling or sexually assaulting M.

¶12    Defense sought to impeach M's testimony on a number of issues, including whether her memory of the night was compromised by alcohol use and her diabetes, whether M's insulin pump was damaged, whether M "liked" Friar and whether the encounter was consensual, whether Friar dragged M into his apartment, whether Friar ripped off M's clothing, and whether Friar strangled M and sexually assaulted her as she told him to stop.  Defense presented video footage from the night of the incident showing M dancing, talking, and making out with Friar and placing her hand on Friar's crotch over his clothes as she whispered in his ear outside the apartment building.  To the jury, defense counsel argued that the encounter in the apartment unit was consensual; that the bruises on M's neck were caused by consensual hickeys and not caused by strangulation; that M's memory was clouded by alcohol consumption, given her diabetes; and that the State had presented evidence of a mere "bad date."

¶13    The jury found Friar guilty of second-degree sexual assault with the use of force and not guilty of strangulation.  Friar subsequently filed a motion for postconviction relief, arguing, pertinent to this appeal, that the circuit court erroneously admitted certain evidence over his objection and that his trial counsel was ineffective.

¶14    At a postconviction hearing, Friar's trial counsel testified that his trial strategy focused on (1) proving that Friar had not strangled M and that therefore he had not used force to sexually assault her, and (2) demonstrating that the encounter had been consensual and that M's "report of the sexual assault was made out of regret rather than out of there actually having been a sexual assault." The postconviction court denied Friar's motion, ruling that the circuit court had acted within its discretion in admitting the challenged evidence and that trial counsel was effective.  This appeal follows.

**DISCUSSION**

¶15     Friar argues that the circuit court committed reversible error by erroneously admitting evidence and that his trial counsel committed certain errors that deprived Friar of his constitutional right to counsel.  We address first the evidentiary issues and then the ineffective assistance of counsel issues.

*I. Erroneous Admission of Evidence.*

¶16     Friar argues that the circuit court erred in admitting three sets of evidence:  (1) photographs showing injuries to M's vaginal area; (2) testimony by M and M's parents regarding M's distraught demeanor in the hours after the alleged sexual assault; and (3) testimony by SANE examiner Hall and M's roommates regarding M's prior consistent statements.  We begin by summarizing general applicable legal principles and the standard of review.  We then address each set of evidence in turn, concluding that:  (1)  the circuit court properly exercised its discretion in admitting the photographs; (2) the circuit court properly exercised its discretion in admitting the post-assault demeanor evidence; (3) Friar forfeited his challenge to admission of Hall's testimony; and (4) the circuit court erred in admitting the roommates' testimony because the testimony did not satisfy the requirements of the prior consistent statement exception to the hearsay rule, WIS. STAT. § 908.01(4)(a)2.(2017-18),[2] but the error was harmless.

---

[2] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

### A. Applicable General Legal Principles and Standard of Review.

¶17 "To be admissible at trial, evidence must be relevant." *State v. Petrovic*, 224 Wis. 2d 477, 493, 592 N.W.2d 238 (Ct. App. 1999). Evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" is relevant. WIS. STAT. § 904.01; *State v. Disch*, 119 Wis. 2d 461, 473, 351 N.W.2d 492 (1984). All relevant evidence is admissible, except as otherwise specifically provided by statute. WIS. STAT. § 904.02; *Disch*, 119 Wis. 2d at 473. Relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." WIS. STAT. § 904.03.

¶18 We generally review a circuit court's ruling on the admissibility of evidence for an erroneous use of discretion. *State v. Miller*, 231 Wis. 2d 447, 467, 605 N.W.2d 567 (Ct. App. 1999). This court will not disturb a circuit court's discretionary decision so long as the record reflects "the circuit court's reasoned application of the appropriate legal standard to the relevant facts of the case." *State v. Harris*, 2008 WI 15, ¶85, 307 Wis. 2d 555, 593–94, 745 N.W.2d 397. "The circuit court's decision will be upheld 'unless it can be said that no reasonable judge, acting on the same facts and underlying law, could reach the same conclusion.'" *State v. Payano*, 2009 WI 86, ¶51, 320 Wis. 2d 348, 768 N.W.2d 832 (quoted source omitted). "If the [circuit] court failed to adequately explain its reasoning, we may search the record to determine if it supports the court's discretionary decision." *Dalka v. Wisconsin Cent., Ltd.*, 2012 WI App 22, ¶51, 339 Wis. 2d 361, 811 N.W.2d 834.

¶19　Although we generally review a circuit court's admission of evidence under the erroneous use of discretion standard, "[t]he application of the hearsay rules embodied in secs. 908.01 and 908.03, Stats., to the undisputed facts" is a question of law that we review de novo. *State v. Peters*, 166 Wis. 2d 168, 175, 479 N.W.2d 198 (Ct. App. 1991); *State v. Sharp*, 180 Wis. 2d 640, 649–50, 511 N.W.2d 316, 320–21 (Ct. App. 1993).

¶20　Where a circuit court erroneously admits evidence, that error is subject to harmless error analysis. *State v. Sherman*, 2008 WI App 57, ¶8, 310 Wis. 2d 248, 750 N.W.2d 500. "[I]n order for an error to be deemed harmless, the party who benefited from the error must show that 'it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" *State v. Martin*, 2012 WI 96, ¶45, 343 Wis. 2d 278, 816 N.W. 2d 270 (quoted source omitted). In assessing harmless error, we focus on whether the error undermines the court's confidence in the outcome of the case. *State v. Grant*, 139 Wis. 2d 45, 53, 406 N.W.2d 744 (1987).

## B. Photographs.

¶21　Friar argues that the circuit court erroneously admitted forensic photographs showing injuries to M's vaginal area because the photographs' inflammatory nature substantially outweighed their relevance under WIS. STAT. § 904.03. As with evidence generally, the admission of photographs is a matter within the circuit court's discretion. *Simpson v. State*, 83 Wis. 2d 494, 505, 266 N.W.2d 270 (1978). An appellate court "will not disturb the court's discretionary decision unless it is wholly unreasonable or the only purpose of the photographs is to inflame and prejudice the jury." *State v. Williams*, 2015 WI 75, ¶84, 364 Wis. 2d 126, 163, 867 N.W.2d 736, 753.

9

¶22    The circuit court admitted the photographs after hearing argument on the probative value of the photographs and their tendency to create prejudice.  The State sought to "publish them, not on the overhead but by passing them around to the jury."  Friar objected, arguing that the photographs "are highly prejudicial and perhaps should be described rather than published to the jury."  The State argued that they are "necessary to publish because they show the actual injury [and] viewing the injury is different than … having the witness describe those injuries," and that "if the injuries from her neck are appropriate for the jury to view and the other various parts of her body, then the injuries to her vagina, although graphic, are relevant."  The following exchange then took place:

> THE COURT:  Okay.  Well, if the victim is comfortable with those being a public record and accessible to anybody who wants to look at the file, then I guess –
>
> [STATE]:  It happens in these cases, Your Honor.
>
> [TRIAL COUNSEL]:  Yes.  I do not object to not publishing them on the overhead and having them passed around.
>
> THE COURT:  Thank you.  And with that –

¶23    The circuit court implicitly accepted the State's explanation of why the photographs were relevant and not unfairly prejudicial—they were distinct from mere descriptions of the injuries resulting from the charged sexual assault and they were no more graphic than the photographs of injuries to other parts of M's body.

¶24    On appeal, Friar argues that the photographs of the injuries were not probative of any element of the offense and were cumulative to Hall's testimony about the details of the injuries.  But, we agree with the State that the photographs showed injuries probative of whether Friar had sexual contact with M and whether

he used force in doing so, which are two of the elements of the offense charged. *See* WIS. STAT. § 940.225(2)(a). Moreover, the photographs were relevant at least as corroboration of M's testimony that her vagina hurt after the assault, that she observed blood coming from her genitals when she urinated, and that it took up to ten days for her vagina to heal. Nor was showing the injuries cumulative to Hall's explanation of the injuries, because, as the State argued, "showing" is different in kind from "describing."

¶25 Friar also argues that the photographs were unduly "graphic" and that "presenting embarrassing, invasive photographs … was only likely to engender more sympathy for M." However, evidence in prosecutions for violent crimes is likely to be graphic. *See, e.g.,* **Williams**, 364 Wis. 2d 126, 164 (concluding that photographs of victims' fatal wounds were not unfairly prejudicial because the purpose of the photographs was to prove an element of the crimes charged, not to inflame the jury). *See also* **State v. Veach**, 2002 WI 110, ¶91, 255 Wis. 2d 390, 648 N.W.2d 447 ("Graphic, disturbing, and extremely prejudicial" evidence is admissible unless it is unfairly prejudicial). Here, introducing the photographs served the legitimate purpose of proving the charge of sexual assault. The circuit court properly exercised its discretion in admitting the photographs.

### C. Demeanor Evidence.

¶26 Friar argues that the circuit court erred in admitting testimony by M and M's parents regarding M's distraught demeanor when she called her parents from the hospital in the hours after the assault because the probative value of that testimony was substantially outweighed by the danger of unfair prejudice or needless presentation of cumulative evidence under WIS. STAT. § 904.03. We

conclude that the circuit court properly exercised its discretion in admitting the challenged testimony.

¶27    M testified that when she called her parents during her SANE exam, she was crying, unable to form words, breathing heavily, and "really, really sad." M's parents testified that M was normally cheerful but that on the phone M was "shaky," "crying," "meek and hurt," and "upset."

¶28    The circuit court heard arguments on the admissibility of this testimony about M's demeanor in the hours after the assault and considered an unpublished authored decision from this court, *State v. Lattimore*, 2014 WI App 110, 357 Wis. 2d 720, 855 N.W.2d 903, as persuasive authority.  In that case, which like this case involved a sexual encounter between two college students, we concluded that evidence of the victim's demeanor following the sexual assault was relevant to the issue of whether she had consented to sex.  *Id.*, ¶30.  We also concluded that the probative value of the demeanor evidence far outweighed its danger of unfair prejudice under WIS. STAT. § 904.03.  *Id.*, ¶32.  The circuit court in this case determined that *Lattimore* "was squarely on point as to the same issues here" and that, consistent with *Lattimore*, testimony about M's demeanor shortly after the assault was "relevant as to her credibility, particularly in light of the fact that this really is a consent case, and her credibility is a significant issue."

¶29    Friar argues that *Lattimore* was wrongly decided and relies on *State v. Jensen*, 147 Wis. 2d 240, 432 N.W.2d 913 (1988) and on *State v. Robinson*, 146 Wis. 2d 315, 431 N.W.2d 165 (1988) to suggest that evidence of a victim's demeanor is admissible only to rebut a defense argument that a victim's demeanor is inconsistent with that of a sexual assault victim.  But both *Jensen* and *Robinson* dealt with the admission of expert testimony about the accuser's post-

assault behavior, and are therefore inapplicable to the admission of the lay observations of post-assault demeanor here. To the extent that Friar asks us to create a new rule of evidence that would generally exclude otherwise relevant demeanor evidence unless it is offered to rebut an accusation that the accuser's demeanor following the assault had been insufficiently victim-like, we decline to do so.

¶30 We conclude that the circuit court did not erroneously exercise its discretion in admitting the limited testimony about M's demeanor in the hours after the assault. The court reasonably determined that her demeanor shortly after the assault was highly probative as to consent, an element of the crime charged, and as to her credibility concerning consent. As to the danger of unfair prejudice, the court consulted persuasive case law and made a reasoned analogy between the facts of *Lattimore* and the facts of the case at hand. We will not disturb the circuit court's discretionary decision when, as here, the record shows that the court engaged in a reasoned application of the appropriate legal standard to the relevant facts. *See Harris*, 307 Wis. 2d 555, ¶85.

### D. Prior Consistent Statements.

¶31 Friar argues that the circuit court erred in admitting testimony of M's prior consistent statements to SANE examiner Hall and to M's roommates, asserting that these statements were inadmissible hearsay because they did not meet the requirements of Wisconsin's prior consistent statements statute, WIS. STAT. § 908.01(4)(a)2.

¶32 As we explain, we conclude that Friar has forfeited his challenge to the admission of Hall's testimony. With respect to the roommates' testimony, we

conclude that their testimony was admitted in error but further conclude that the error was harmless.

### 1. Hall's Testimony About M's Prior Consistent Statements.

¶33     On appeal, Friar asserts that certain prior statements made by M to Hall, which came in through Hall's testimony, were inadmissible hearsay because they were consistent with M's testimony at trial and unrelated to her medical diagnosis or treatment.  The problem with this argument, as the postconviction court concluded, is that Friar forfeited his objection to the admission of Hall's testimony by failing to object to admission of that testimony at trial.

¶34     A party who fails to object specifically to testimony in the circuit court has forfeited that objection, and this court will not review the asserted error on appeal. *Holmes v. State*, 76 Wis. 2d 259, 272, 251 N.W.2d 56 (1977); *see also* WIS. STAT. §§ 901.03(1) and (1)(a) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected; and … [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context.").  "Whether a party objected to the admissibility of evidence in a manner sufficient to preserve the issue for appeal" is a question of law that we review de novo. *Peters*, 166 Wis. 2d at 174.

¶35     Friar concedes that he "did not specifically object to hearsay during [SANE examiner] Hall's testimony," but he argues that his objection to the testimony of M's roommates should have preserved an objection to Hall's testimony "because he articulated the specific reasons why M's prior statements to a witness about the offense constituted hearsay, and the court overruled."  Friar

14

asserts that "[a] general objection to a category of evidence may be sufficient to preserve specific objection for review," citing *Peters*, 166 Wis. 2d at 175. However, *Peters* is inapposite. In *Peters*, this court held that the defendant's stated objection to one witness's testimony based on lack of personal knowledge, after the defendant "had just objected to similarly offered testimony by other witnesses on hearsay grounds[,] … was sufficiently specific to reasonably apprise the court that his objection was based on hearsay grounds." *Id.* Here, in contrast, Friar made no objection, specific or otherwise, to Hall's testimony. Neither *Peters* nor WIS. STAT. § 901.03(1)(a) can preserve an objection that Friar failed to make.

¶36 In sum, we conclude that Friar forfeited his objection to Hall's testimony about M's prior consistent statements.[3]

2. Roommates' Testimony About M's Prior Consistent Statements.

¶37 A statement that would ordinarily be hearsay is not hearsay if "the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement" and the statement is "[c]onsistent with the declarant's testimony" and "is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." WIS. STAT. § 908.01(4)(a)2. Thus, under the statute, a prior consistent statement is admissible if: (1) the declarant testifies at trial and is subject to cross-examination concerning the statement; (2) the statement is consistent with the declarant's testimony; and (3) the statement is offered to rebut an express or implied allegation against the declarant of recent fabrication or improper influence or motive. *Miller*, 231

---

[3] We separately address Friar's claim that trial counsel was ineffective for failing to object to Hall's testimony including M's prior consistent statements below.

Wis. 2d at 470. It is the third requirement that Friar argues was not satisfied by M's prior consistent statements to her roommates.[4]

¶38 Under this third requirement, "the prior consistent statements must predate the alleged recent fabrication or improper influence or motive before they have probative value." *Peters*, 166 Wis. 2d at 176-77. Although this "pre-motive rule" was questioned in *State v. Sharp*, 180 Wis. 2d 640, the rule was subsequently affirmed by the United States Supreme Court in *Tome v. United States*, 513 U.S. 150, 154, 167 (1995) (interpreting Fed. R. Evid. 801(d)(1)(B)(i), which is identical to WIS. STAT. § 908.01(4)(a)2., and holding as inadmissible hearsay prior consistent statements made *after* the alleged motive to fabricate). *See* ***Donaldson v. West Bend Mut. Ins. Co.***, 2009 WI App 134 ¶26 n.9, 321 Wis. 2d 244, 773 N.W.2d 470 ("When a state statute mirrors federal law, we may look to federal cases for guidance in interpreting the state statute.") (quoting ***Strassman v. Muranyi***, 225 Wis. 2d 784, 790, 594 N.W.2d 398 (Ct. App. 1999)).

¶39 The pre-motive rule remains the law in Wisconsin. *See* ***State v. Street***, 202 Wis. 2d 533, 551, 551 N.W.2d 830 (Ct. App. 1996) (holding admissible children's prior consistent statements offered to rebut a charge that the children had been coached where the statements were made *before* the alleged coaching). Thus, in applying the rule, the circuit court must consider both the

---

[4] Friar argues that the circuit court omitted the third requirement of "recency" when considering whether to admit the roommates' testimony about M's prior consistent statements. However, the record shows that this is incorrect. Friar references one occasion on which the court did not use the word "recent" but fails to mention that that reference occurred after the court had twice correctly articulated the statutory standard. While, as we explain below, we conclude that the court did not properly apply the third requirement of the statutory standard to the facts of the case, the record clearly demonstrates that the court was aware of and consulted the correct legal standard. We caution counsel against such imprecise and unmerited criticism of the circuit court.

alleged fabrication and the time when the alleged influence or motive for the fabrication arose.

¶40 With that background, we turn to the trial testimony of the roommates. Consistent with M's testimony, the roommates testified in pertinent part that, in the morning hours after the assault, M told them that she had been sexually assaulted by "Nathan," who had invited her to his apartment for an after-party. It is undisputed that M's roommates understood M's statements about "Nathan" to refer to Friar. They testified that she told them there was in fact no after-party, that Friar grabbed her forcefully and she blacked out, and that when she regained consciousness she quickly left. One roommate testified that M said Friar pushed her onto his bed and strangled her and another testified that M said that Friar grabbed her by the throat and strangled her as she repeatedly told him "No. Please stop. Be careful."

¶41 Friar objected to the roommates' testimony as inadmissible hearsay. The circuit court overruled Friar's objection, explaining that, under WIS. STAT. § 908.01(4)(a)2., the statements were a prior consistent statement "offered to rebut an express or implied charge that [M] is fabricating or making up this story." We now explain our conclusion that the court erred in admitting the roommates' testimony because the record shows that those statements occurred *after* M, according to Friar, had a motive to lie.

¶42 Friar argues that, "while the defense certainly alleged M's version of events was fabricated, there was no claim that the fabrication was 'recent.' Instead, the defense argued M's claims were fabricated from the very beginning" and that M "overreacted after seeing the neck bruises from the hickeys." We understand Friar's argument to be that M's alleged motive for lying was, in the

17

term he used in the circuit court, her immediate "regret" following a consensual encounter with Friar, and that her statements to her roommates therefore did not predate her motive to fabricate. The State argues in general that defense counsel, through his cross-examination of M, implied that M was embellishing her testimony and making up facts to fill gaps in her memory, solely for the benefit of trial.

¶43 On this point, we agree with Friar. The record demonstrates that, although defense implicitly charged M with fabricating certain details for the benefit of trial (for example, about whether her memory of the evening was clear and about whether her insulin pump was damaged), those implied charges were not rebutted by M's prior consistent statements to her roommates. M's statements as testified to by her roommates did not reference those details. Rather, M's prior consistent statements rebutted the defense's charges of fabrication of the "story" that M told her roommates, including whether the encounter was consensual and whether Friar strangled and assaulted M.

¶44 Because M's motive to lie about these matters, as alleged by the defense, existed immediately after her encounter with Friar, M's prior consistent statements to her roommates were made after that motive to lie arose and, therefore, do not satisfy the third "pre-motive" statutory requirement stated above. Accordingly, we conclude that the circuit court erred in admitting the roommates' testimony about those statements.[5]

---

[5] The State does not argue that the statements are admissible under any other rule.

¶45 The State argues that any error by the circuit court was harmless, and on this point we agree with the State. As stated, "[I]n order for an error to be deemed harmless, the party who benefited from the error must show that 'it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" *Martin*, 343 Wis. 2d 278, ¶45 (quoted source omitted). The *Martin* court went on to identify several non-exhaustive factors that assist courts in analyzing whether an error is harmless:

> the frequency of the error; the importance of the erroneously admitted evidence; the presence or absence of evidence corroborating or contradicting the erroneously admitted evidence; whether the erroneously admitted evidence duplicates untainted evidence; the nature of the defense; the nature of the State's case; and the overall strength of the State's case.

*Id.*, ¶46. We review the totality of the circumstances to determine harmless error. *Harris*, 2008 WI 15, ¶48. Consistent with these legal principles, we conclude that the error in admitting the roommates' testimony of M's prior consistent statements was harmless.

¶46 First, the alleged error was limited to evidence that was not important to the verdict and was duplicated by untainted evidence. The primary importance of the roommates' testimony to the State's case was to show that M had immediately disclosed the assault. But testimony from law enforcement, Hall, and M's parents would have accomplished this purpose even if the roommates' testimony had been properly excluded. Also, in addition to M's testimony that Friar had strangled and acted with force against her without her consent, the jury heard testimony from Hall and from law enforcement on the strangulation, use of force, and consent issues. Furthermore, Friar does not argue that the exclusion of the roommates' testimony would have changed the defense strategy.

¶47     Second, the State's overall case was strong.  The jury saw video evidence showing that M was not bruised when she entered Friar's apartment but that she was bruised when she exited it a few hours later.  They saw photographs from the forensic examination showing that M had sustained bruising to the left and right sides of the neck, the right shoulder area, the collarbone, the upper chest, and the lower back.  M's testimony was also corroborated by evidence of her demeanor after the assault, by her texts to her roommates upon regaining consciousness, by her prompt reporting to law enforcement, by her SANE examination, and by her calls to her siblings and parents during that examination. The erroneous admission of the roommates' testimony, in light of the strength of the above-referenced evidence presented by the State in rebutting Friar's defense theory, does not suffice to "undermine [our] confidence in the outcome of the case." *State v. Grant*, 139 Wis. 2d at 53.

¶48     Friar argues that this was a "he said, she said" case and that the jury's failure to convict on the strangulation charge shows that the jury did not fully believe M's testimony.  We disagree.  This is not a case in which the jury had to rely only on the defendant's testimony and the complainant's testimony. Rather, the jury considered video footage, photographs, forensic examination reports, police reports, and testimony from many witnesses.  The jury saw evidence showing that M blocked Friar's number and urgently texted her friends for help the moment she escaped Friar's bedroom.  The jury saw text messages from Friar to his friends confirming that he "blacked the [profanity] out," that he "threw [his] brat in [M]," and that he "just knew something must have went [profanity] awful."  The jury considered evidence from which it could have reasonably inferred that, within hours of the alleged assault, M called two police departments, spent six hours at the hospital submitting to an invasive forensic

exam, frantically called every member of her immediate family, and was distraught. The jury heard testimony from the forensic examiner that M had sustained injuries to multiple portions of her external genitalia.

¶49    In contrast, Friar admitted on the stand to lying about his memory of the night in question, and defense counsel asked the jury to believe that Friar was lying when he repeatedly told his friends he blacked out but that he was telling the jury the truth when he said he had not been very drunk and that he had a perfectly clear memory of the night. Although Friar argues that the bruises on M's neck were caused by consensual hickeys rather than by strangulation, he does not point to any evidence, or to any argument by the defense at trial, that could support an alternative explanation for bruises to M's back, shoulder, and arms.

¶50    Nor are we persuaded that the split jury verdict is an indication that the jury did not believe M. Assuming without deciding that we can safely infer any particular reasoning from a split jury verdict in any case, the jury instructions on the strangulation charge specifically directed that in order to find guilt the jury had to find that "[t]he defendant impeded the normal breathing or circulation of blood by applying pressure on the throat or neck or by blocking the nose or mouth" of M, and that he did so "intentionally," defined as "with the mental purpose to impede normal breathing or circulation of blood" or with the awareness "that his conduct was practically certain to cause that result." The State presented evidence of force beyond the strangulation charge, including M's testimony that Friar pinned her down and forensic photographs showing bruising to her arm, shoulder, collarbone, and back. The jury could have found based on this evidence that Friar applied force not to impede M's breathing or circulation but to sexually assault her.

¶51 In sum, we conclude that the State has shown beyond a reasonable doubt that the jury would have found Friar guilty of sexual assault absent the erroneous admission of the roommates' testimony about M's prior consistent statements.

## II. *Ineffective Assistance of Counsel.*

¶52 Friar argues that his trial counsel made three errors that deprived him of the right to constitutionally effective counsel: (1) counsel failed to object to SANE examiner Hall's testimony; (2) counsel failed to impeach certain of M's statements; (3) counsel failed to retain an expert on the effect of alcohol consumption on someone, such as M, who has type 1 diabetes. We first summarize the standard of review and applicable legal principles, and then analyze each of Friar's asserted errors in turn.

### A. Standard of Review and Applicable Legal Principles.

¶53 "Under the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant is guaranteed the right to effective assistance of counsel." *State v. Lemberger*, 2017 WI 39, ¶16, 374 Wis. 2d 617, 893 N.W.2d 232. The same right is guaranteed by Article I, Section 7 of Wisconsin's Constitution. *State v. Breitzman*, 2017 WI 100, ¶37, 378 Wis. 2d 431, 904 N.W.2d 93. To demonstrate that counsel's assistance was ineffective, the defendant must establish two elements: that counsel's performance was deficient and that the deficient performance was prejudicial. *Id.* (citing *Strickland v. Washington*, 466 U.S. 668 (1984)).

¶54 "Whether a defendant received ineffective assistance of counsel is a mixed question of law and fact." *State v. Maday*, 2017 WI 28, ¶25, 374 Wis. 2d

164, 892 N.W.2d 611. The circuit court's findings of fact will not be disturbed unless those findings are clearly erroneous. *Id.* "'[T]he circumstances of the case and … counsel's conduct and strategy' are considered findings of fact." *Id.* (quoted source omitted). However, whether those facts constitute deficient performance and whether such deficient performance was prejudicial are questions of law that we review independently. *See **State v. Tulley**,* 2001 WI App 236, ¶5, 248 Wis. 2d 505, 635 N.W.2d 807; ***State v. Kimbrough**,* 2001 WI App 138, ¶27, 246 Wis. 2d 648, 630 N.W.2d 752 (determination of counsel's effectiveness is a question of law reviewed de novo).

¶55     "[T]here is no reason for a court deciding an ineffective assistance claim … to address both components of the inquiry if the defendant makes an insufficient showing on one." ***Strickland**,* 466 U.S. at 697. We decide each of Friar's asserted errors under the deficient performance prong.

¶56     Whether trial counsel's performance was deficient is a question of law that this court reviews de novo. ***State v. Domke**,* 2011 WI 95, ¶33, 337 Wis. 2d 268, 805 N.W.2d 364. Performance is deficient if it falls below "an objective standard of reasonableness." ***State v. Thiel**,* 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305. There is generally a strong presumption that trial counsel's conduct falls within the wide range of reasonable professional assistance. ***Strickland**,* 466 U.S. at 689-91; ***State v. Carter**,* 2010 WI 40, ¶22, 324 Wis. 2d 640, 782 N.W.2d 695. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." ***Strickland**,* 466 U.S. at 689.

¶57    Counsel's decisions in forming a trial strategy are afforded great deference. *Breitzman*, 378 Wis. 2d 431, ¶38; *State v. Balliette*, 2011 WI 79, ¶26, 336 Wis. 2d 358, 805 N.W.2d 334. "A court must be vigilant against the skewed perspective that may result from hindsight, and it may not second-guess counsel's performance solely because the defense proved unsuccessful." *Balliette*, 336 Wis. 2d 358, ¶25 (citing *Strickland*, 466 U.S. at 689 and *State v. Harper*, 57 Wis. 2d 543, 556–57, 205 N.W.2d 1 (1973)). Counsel must "either reasonably investigate the law and facts or make a reasonable strategic decision that makes any further investigation unnecessary." *Domke*, 337 Wis. 2d 268, ¶41. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. "Even decisions made with less than a thorough investigation may be sustained if reasonable, given the strong presumption of effective assistance and deference to strategic decisions." *Balliette*, 336 Wis. 2d 358, ¶26.

¶58    Where a circuit court has identified reasonable trial strategy, that strategy "is virtually unassailable in an ineffective assistance of counsel analysis." *Breitzman*, 378 Wis. 2d 431, ¶65 (quoting *State v. Maloney*, 2004 WI App 141, ¶23, 275 Wis. 2d 557, 685 N.W.2d 620). We will not second-guess a reasonable trial strategy unless it "was based on an irrational trial tactic or [was] based upon caprice rather than upon judgment." *Breitzman*, 378 Wis. 2d 431, ¶65. Instead, we evaluate the complained-of conduct from counsel's perspective at the time. *Id.* However, counsel's mere assertion that a decision was strategic will not insulate it from the deficient performance analysis. This standard "'implies deliberateness, caution, and circumspection' and the decision 'must evince reasonableness under the circumstances.'" *State v. Honig*, 2016 WI App 10, ¶30, 366 Wis. 2d 681, 874 N.W.2d 589 (quoted source omitted).

24

¶59　In assessing whether trial counsel's challenged acts or omissions were reasonable, we are not limited to the strategies and explanations articulated by counsel. Rather, the question is objective: under the circumstances of the cases as they existed at the time of trial, could the challenged conduct or failure to act have been justified by an attorney exercising reasonable professional judgment? *See* **State v. Koller**, 2001 WI App 253 ¶8, 248 Wis. 2d 259, 635 N.W.2d 838 (court "may rely on reasoning which trial counsel overlooked or even disallowed"), *modified on other grounds* by **State v. Schaefer**, 2003 WI App 164, 266 Wis. 2d 719, 668 N.W.2d 760).

## B. Failure to Object to SANE Examiner Hall's Testimony.

¶60　SANE examiner Hall's testimony included reading a part of her report that purported to summarize M's narrative account of the alleged sexual assault. She read:

> I met a few friends at [a bar] after work, about 11:30 p.m. We had one drink there, and then we went to [a second bar] to meet other friends. While I was there, this guy Nate texted. I met him on Thursday. He asked where I was, and he said he would meet me there. I went over to talk to him in the bar about 1:30 to 1:45 p.m. I had two shots and — two drinks and one shot at that bar. At bar time I couldn't find my friends, and he said he would walk me home, Nate. When we got to [Friar's apartment building], he asked if I wanted to come up with other people hanging out. We went up, and there were a couple guys, but they were going to bed. He took me to his room and then immediately started aggressively kissing me. He pushed me onto the bed. He was very … rough and was taking my clothes off. He pinned me down by my arms and choked me.... I couldn't breathe. He alternated between pinning me down and choking me. I don't remember everything. It's like I blacked out when I couldn't breathe. Multiple times I said, "Stop. Stop. No. I don't want to do this." He wouldn't stop. He was aggressive and forceful. I waited until he fell asleep and frantically searched for my stuff. Then I texted my roommates and walked two blocks home. I told my

roommates this morning, and they said that I should call the police.

¶61    Friar argues that his trial counsel should have objected to Hall's reading of this narrative statement because portions of it were inadmissible hearsay (including M's prior consistent statements) and that counsel should have objected to subsequent questioning of Hall "duplicating information from the narrative statement" as cumulative.

¶62    Trial counsel testified that he chose not to object to the testimony for two reasons:  (1) he did not expect his objection to be successful based on the circuit court's previous rulings on the defense's objections; and (2) he believed that allowing Hall to read the single-paragraph narrative without interruption would enable him to get past that part of her testimony and focus the jury's attention on "the points that I wanted to hit with her."  The postconviction court found that trial counsel "took steps to minimize the impact of the testimony by allowing [Hall] "to read the narrative statement into the record without interruption" and by cross-examining Hall to show that she was not "vouching for M's version of events."

¶63    The postconviction court's findings of fact as to trial counsel's strategy are not clearly erroneous.  Counsel's strategy was formed based on his observation of the circuit court's previous evidentiary rulings, *see* ***Carter***, 324 Wis. 2d 208, ¶39 (an attorney is not deficient for failing to raise objections that would be futile), and his beliefs about how both to minimize the impact of the testimony on the jury and to focus its attention on such points as inconsistencies between M's statements and Hall's observations.  His strategy was executed through his cross-examination of Hall.  That strategy objectively applied equally to Hall's reading of the narrative statement and to the prosecutor's questioning of

Hall that followed regarding the statement.[6] It was not the result of an "irrational trial tactic" or "based upon caprice rather than upon judgment." ***Breitzman***, 378 Wis. 2d 431, ¶65. We conclude that Friar has not shown that his trial counsel was deficient in failing to object to Hall's reading of the narrative portion of her report or to the prosecutor's questioning that followed.

## C.  Failure to Impeach M.

¶64     Friar argues that his trial counsel performed deficiently by failing to further impeach M's credibility on issues related to her previous statements regarding:  (1) her memory of the sexual assault, (2) her alcohol consumption, and (3) her genital injuries.  Friar argues that on each of these topics, counsel should have more strenuously impeached M's account during cross-examination of M and other witnesses.  As to all of these topics, the postconviction court concluded that Friar failed to show deficient performance, based on its finding that counsel "articulated strategic reasons for not pursuing certain topics with M, including that the inconsistencies were established by other evidence and that he did not want to open the door to evidence that might rehabilitate M's testimony."  The court declined to "sit as a 'Monday-morning quarterback,'" quoting ***State v. Bethly***, 175 Wis. 2d 623, 502 N.W.2d 282 (Ct. App. 1993), and second-guess counsel's strategic decisions in cross-examining witnesses or emphasis of some points over others in closing argument.  We proceed to address each topic in turn.

---

[6] Friar's trial counsel testified that he "should have" objected to the questioning that followed Hall's reading of the narrative statement.  However, we conclude that not objecting was objectively reasonable for the same strategic reasons that counsel offered for his not objecting to the reading of the narrative statement to begin with, based on his overall objectives and how he reasonably expected the circuit court would rule on any objections.

### 1. Prior Statements Regarding Memory of the Sexual Assault.

¶65　Friar argues that his trial counsel should have used prior statements by M to her roommates and to law enforcement to demonstrate what Friar contends was M's lack of memory of any sexual contact or intercourse.

¶66　By way of background, we present from the record M's statements to which Friar refers.

¶67　First, a law enforcement report purporting to reflect an interview with one of M's roommates states:

> I asked [M's roommate] if [M] had told her about any sexual contact between the two of them. [M's roommate] said, "She didn't remember. After he was aggressive with her, she said she passed out or blocked it out. She doesn't remember any intercourse."

¶68　Second, a law enforcement report purporting to reflect an interview with a second roommate states:

> [M's roommate] stated, "I didn't know he had raped her, until I put it together."
>
> When asked how she "put it together," [M's roommate] stated that she figured out that [M] was sexually assaulted when [M] told her about what kinds of tests had been done to her at the hospital. [M's roommate] stated specifically that [M] told her that there was an "internal assessment" done by a nurse and that the nurse could "definitely tell that there were internal abrasions."
>
> I asked [M's roommate] if [M] told her anything about the actual sexual assault. [M's roommate] stated that [M] told her that she "didn't remember that part." [M's roommate] said that [M] thought she may have blacked out from stress, or did not remember because "of the way he choked her."

28

¶69    Third, an initial law enforcement report purporting to reflect an interview with M prior to her SANE exam states:

> [M] stated that … [Friar] grabbed her by the neck and pushed her onto the bed and held her down. [M] said that she said "No, stop, stop, don't. Stop. I don't want to do this!" But he did not stop and then he took her clothes off aggressively. [M] said she told him he was being too aggressive and you're not supposed to treat a lady like this. [M] said she then started to black out the incident because she did not want to have sex with him.
>
> [M] did not know if there was sexual intercourse or if he had digitally penetrated her or if there was any oral sex. [M] does have discomfort in the vaginal area.

¶70    Counsel testified that he considered cross-examining M about these statements, and that he ultimately made a strategic decision not to do so because M's statements about being unable to remember if intercourse occurred were closely linked with her statements that she had lost consciousness while Friar strangled her. He explained that arguing that M "had no recollection was a little bit dangerous, because the jury could have interpreted that to have been related to the strangulation and suffocation. And we absolutely positively had to, you know, show the jury that strangulation and suffocation never happened." Counsel also testified that he was satisfied that the cross-examination he did conduct "had been very effective in showing that she had made several material misstatements."

¶71    Friar appears to concede that his trial counsel made a reasonable choice to not cross-examine M about the above statements. Nevertheless, Friar makes a point based on timing. He argues that, after the circuit court admitted testimony about the strangulation during the direct examination of M's roommates, counsel should have realized that he then had a risk-free, possibly productive opportunity to cross-examine them about M's statements that she could not remember any sexual contact or intercourse. However, we conclude that, at

that point, it was still reasonable for counsel to decide that it was best not to draw attention to M's prior statements specifically about lack of memory, given that M's prior statements indicated that her lack of memory was caused by losing consciousness as she was strangled. The same rationale existed, even if the roommates' statements might have made the topic somewhat more attractive to the defense.

¶72 Furthermore, Friar's focus on the parts of M's prior statements to law enforcement and her roommates that she did not know whether sexual contact or intercourse occurred disregards the parts of those statements in which she said that she had been sexually assaulted. The same law enforcement report that records a roommate reporting that M did not "remember any intercourse" because "she passed out or blocked it out" also contains the roommate's statement that the first thing M said to her in the hours after the assault was "I was sexually assaulted." Similarly, both roommates testified on the stand that on the morning after the assault M "said that she had been sexually assaulted." Immediately after her initial law enforcement interview, M submitted to a SANE examination in which she reported that that Friar's penis had contacted her external genitals, that Friar's fingers contacted her external genitals, and that Friar's fingers entered her vagina. At a second interview with law enforcement, M reported that she could "feel [Friar's] fingers in [her] vagina" during the assault and that it was "painful."

¶73 Counsel's decision to not cross-examine M's roommates about M's statements that she could not remember any sexual contact or intercourse was a reasonable precaution against highlighting her statements that she was sexually assaulted and did remember certain details of the alleged assault before she blacked out. This is particularly true given that counsel, as Friar states, did attempt to impeach the roommates with M's prior inconsistent statements about

other details of the encounter. In addition, to repeat, it was a reasonable approach for counsel to decide that cross-examining M's roommates on this issue was likely to re-focus the jury on M's claims of strangulation and undermine counsel's strategy of "show[ing] the jury that that strangulation and suffocation never happened."

¶74 Similarly, it was reasonable for trial counsel not to further attempt to impeach M based on her initial statements to law enforcement. This is particularly true given that counsel cross-examined the officer whose report stated "[M] did not know if there was sexual intercourse or if he had digitally penetrated her or if there was any oral sex." Further, the officer testified to the following: he did not ask M for details of the sexual assault because he knew a detective would be assigned to the case and he did not want M to have to repeat the traumatic details; his report contained omissions; he gathered only initial information; he asked M "what happened?" but did not ask "a lot of follow up questions"; this was not some of his "best documentation." We conclude that Friar fails to show that his trial counsel rendered deficient performance on this issue.

### 2. Statements Regarding Alcohol Consumption.

¶75 Friar argues that his trial counsel should have impeached M with inconsistencies in her account of how much alcohol she had consumed the night of the encounter with Friar. During cross-examination, M testified that she had "at least one drink" before she went to the bar where she met Friar and "at least two drinks" at the bar. Friar argues that counsel should have impeached M with Hall's report indicating that M had reported consuming an additional shot of alcohol. Counsel testified that he considered cross-examining M about her statement to Hall that she had consumed an additional shot but that he ultimately chose not to

31

because he knew the evidence would come in through Hall's testimony. Counsel further testified that he should have referenced this one-shot inconsistency in his closing.

¶76 We conclude that Friar has not shown that his trial counsel rendered deficient performance by failing to impeach M with her statement to Hall that she had an additional shot of alcohol. Given that M testified at trial that she had "at least" three drinks of alcohol, the difference between her trial testimony and her report to Hall was, at most, one drink. Counsel reasonably relied on the certainty of Hall's testimony to show the jury that there was doubt about whether M consumed three or four drinks of alcohol. Friar points out that counsel testified that he should have highlighted the discrepancy in his closing arguments. However, as the postconviction court found, counsel did argue at trial that M's drinking caused her to not remember and to be confused about the night of the alleged assault. It was reasonable for counsel to focus on the arguably significant effect of her drinking, rather than on the trivial difference between "at least three drinks" and "four drinks." Indeed, it would have been reasonable of trial counsel in this position to have been concerned that such an argument would have generated sympathy for M if counsel appeared to be impeaching her honesty on trivial grounds.

### 3. Characterization of Genital Injuries.

¶77 Friar argues that his trial counsel should have clarified with Hall that M's genital injuries were, as Hall described them, "scratches and abrasions," not, as M testified, "tears," so that the jury was informed of the difference between the two. Friar contends that tears are "deeper" than abrasions. Trial counsel testified that he did not consider "whether or not to split those hairs [between abrasions and

32

tears] in front of the jury." He further testified that his strategy was to elicit testimony from Hall that M's genital injuries could be consistent with consensual sex.

¶78     We conclude that Friar fails to show that his trial counsel rendered deficient performance in failing to cross-examine Hall regarding the difference between "abrasions and scratches," the terms used by a medical professional, and "tears," the term used by M.  Counsel made a reasonable strategic choice to emphasize that the injuries could be consistent with consensual sex.  Highlighting the difference between various types of injuries may have only obscured counsel's emphasis on the significance of the injuries as being consistent with consensual sex and focused the jury's attention on M's allegations of pain.

### D.  Failure to Obtain Expert Witness.

¶79     Friar argues that his trial counsel was deficient in failing to call an expert on the possible effects on memory of type 1 diabetes, particularly after alcohol consumption.

¶80     During trial, M testified that neither her alcohol consumption nor its interaction with her diabetes clouded her memory or judgment and that, until she blacked out while Friar strangled her, her memory of the evening was clear.

¶81     In support of his motion for postconviction relief, Friar presented a report of an expert explaining that the combination of diabetes and alcohol consumption can cause hypoglycemia (low blood sugar) leading to cognitive and memory impairment.  Friar argues that such testimony would have bolstered the defense's theory that M could not remember the evening.  Friar concedes that the absence of records regarding M's blood glucose levels at the time of her contact

with Friar precluded any definite opinion about whether she was hypoglycemic at that time, but argues that counsel's failure to retain a diabetes expert left him unprepared to impeach M's testimony that her diabetes did not affect her memory on the night in question. Friar argues that counsel's strategic decision not to call an expert is not entitled to deference because it was based on inadequate investigation.

¶82 Friar's trial counsel testified that he was aware that alcohol consumption can have a "wide-ranging" effect on a person's blood glucose levels. Counsel testified that questioning M about the interaction between her alcohol consumption and her diabetes comprised only a small "substrategy" of his trial strategy "because we had so little information about her diabetes." Counsel explained that he had considered calling an expert witness and filing a motion to obtain M's medical records, but that he chose not do so because he knew that such a record would not contain "any specific information as to what her specific blood glucose levels were that evening." Instead, counsel planned to question M herself about her experiences with alcohol and diabetes and planned to question the SANE examiner about the topic. He testified that he would expect any nurse to know information about alcohol and blood glucose in type 1 diabetics, and admitted that it was only when the State raised an objection during trial that he realized he could not get into that topic without calling an expert in endocrinology or toxicology. At that point, counsel recognized a need for an expert, but "[b]y that point it was too late to have an expert on hand." He testified that he was "shocked" by some of M's testimony about diabetes and alcohol that he perceived to be inaccurate. Counsel testified, "[I]f I had this to do over again, I would have an expert on board."

¶83     The postconviction circuit court found that, because M's blood sugar levels for the time in question were unavailable, an expert could not have formed an opinion on whether or how M's alcohol consumption and diabetes may or may not have interacted to compromise her memory.     The court concluded that counsel's performance in failing to retain an expert who could offer little probative evidence was not deficient.

¶84     We conclude that Friar fails to show that his trial counsel's failure to retain an expert on type 1 diabetes and alcohol consumption was deficient performance.     Based on his knowledge that M's medical records would not contain glucose readings for the time that M was with Friar, counsel made a strategic decision to confine the theory that M's diabetes affected her memory to only a small "substrategy" of the defense.     Facing a dearth of "any specific information as to what her specific blood glucose levels were that evening," counsel focused instead on the defense theory that the encounter between M and Friar was consensual and that M reported the sexual assault out of regret rather than because an assault actually occurred.

¶85     Counsel's testimony that he would have retained an expert if he could re-do his representation does not render unreasonable his strategic decision at the time.     A conscientious attorney likely often wishes that he or she had handled some aspect of trial differently.     "A court must be vigilant against the skewed perspective that may result from hindsight, and it may not second-guess counsel's performance solely because the defense proved unsuccessful." *Balliette*, 336 Wis. 2d 358, ¶25.     Counsel made this decision before trial, and evaluating counsel's decision from his "'perspective at the time,'" *Breitzman*, 378 Wis. 2d 431, ¶65 (quoted source omitted), we conclude that Friar's counsel reasonably

decided that calling an expert would be pointless in the absence of any information about M's glucose levels on the night in question.

¶86 Friar points to counsel's testimony that he was surprised when the State objected to counsel's questioning the SANE examiner about alcohol and diabetes and when M gave what counsel perceived as inaccurate testimony on the topic. Friar argues that this surprise shows that counsel was unprepared and that he made the decision not to call an expert based on inadequate investigation. Friar relies on *Thiel*, 2003 WI 111, ¶40, to argue that counsel's decision was not objectively reasonable because it was not an informed decision. However, Friar does not support his assertion that counsel's decision was uninformed. Again, counsel provided a reasonable explanation for his decision. Counsel also questioned M extensively on the topic, and it was reasonable to expect that she would either testify truthfully about her experiences with alcohol or that, if she did not appear to do so, this might lessen her credibility with jurors who have at least some familiarity with the common disease of diabetes. Further, counsel correctly concluded that M's specific glucose numbers from the night in question would not be available in her medical record so as to provide a basis for an expert opinion that could have any real weight in these circumstances.

¶87 In sum, we conclude that Friar fails to show that his trial counsel's failure to call an expert on type 1 diabetes and alcohol consumption was deficient performance.

**CONCLUSION**

¶88 For the reasons stated above, we reject all of Friar's arguments and affirm the judgment of conviction.

*By the Court.*—Judgment and order affirmed.

Not recommended for publication in the official reports.